# SENTINEL FIRE INS. CO. v. WEEMS et al.—222 S. W. (2d) 626.

Knoxville.   Filed February 2, 1949.

. Petition for Certiorari denied by Supreme Court, June 18, 1949.

Jennings, O'Neil & Jarvis, of Knoxville, Susong, Parvin, Fraker & Rogan, of Greeneville, for appellant.

Leon E. Easterly and John A. Armstrong, both of Greenville, for appellees.

SWEPSTON, J. This is an appeal in equity from a decree in favor of defendant, Mrs. Flossie Weems, in a suit tried on depositions. The review is under Code Section 10622 by which there is a prima facie presumption of correctness of the decree below which may be reversed only if we find that the evidence preponderates against the correctness of the decree.

On June 20, 1943 Mrs. Weems suffered the loss by fire of the residence and contents located on her farm of

37½ acres in Greene County. The property was insured with complainant company. Proof of loss was made and upon refusal of the company to pay, she filed suit in the Circuit Court. Summons issued, but before a declaration was filed, the company on February 7, 1944 filed suit to enjoin the suit at law and to have the policies declared void for fraud, alleging that Mrs. Weems, in conspiracy with others, wilfully set fire to and burned said property; that she had made false claims in the sworn proof of loss of personal property, most of which property was not in the building and was not affected by the fire; that she and her step-daughter, Georgia W. Oliver, had fraudulently placed a mortgage on certain personal property, consisting of beauty parlor equipment to secure an alleged debt of $1000.00 to said step-daughter, who aided Mrs. Weems in preparing the fraudulent proof of loss; that Mrs. Weems had violated the provisions of complainant's policy and rendered it void by having other insurance in Greene County Farmers Mutual Association on the same residence; that all of said property was insured far beyond its value that the later policy on the household goods was procured only a few days before the fire and only about a week after her said farm had been advertised for foreclosure sale under a mortgage to secure Home Federal Savings & Loan Association in the sum of $1400.00 on which she had never paid any of the principal; that Mrs. Weems along with another person, or persons, was seen at the premises just before the fire and they were seen fleeing from the scene after the residence commenced to burn and that Mrs. Weems and others had been indicted for arson and were awaiting trial.

The prayer is that complainant be subrogated to the rights of the defendant Loan Association upon the pay-

ment to it of the $1400.00 covered by standard mortgage rider; that Mrs. Oliver's mortgage be held void as being without consideration and fraudulent; that the company be relieved of any other liability under the policies.

The policies involved are Sentinel: #6603 covering $1250.00 on residence, $1000.00 on household goods and $500.00 on barn, the last item not being involved in the fire, issued August 25, 1942; #24794 covering $1000.00 on household goods but intended to be applicable to the beauty parlor equipment dated June 5, 1943.

The Loan Association filed its answer and cross-bill to protect its rights under the mortgage and the standard mortgage insurance rider against all parties.

On July 17, 1944 Mrs. Oliver and Mrs. Weems filed a full and detailed answer and cross-bill in which is denied all averments of the bill unfavorable to either or both of them and in which each circumstance is explained.

Before stating the detailed defenses, we think we may shorten this opinion by reserving them until we discuss the evidence.

The Chancellor found all issues in favor of defendants, gave judgment for a total of $3250.00 in favor of Mrs. Weems against the insurance company; subjected $1000.00 coverage on the beauty parlor equipment to the note of Mrs. Oliver; gave judgment to the Loan Association for the debt due by Mrs. Weems subject to a credit of $1250.00 representing the proceeds of the policy on the residence, and denied Mrs. Weems' request for a twenty-five percent penalty against the insurance company.

The company has thirteen assignments of error which are too long to be quoted verbatim.

The first six and the tenth relate to the facts. They are in substance that the preponderance of the evidence shows conspiracy to burn the property, false swearing as to the origin of the fire and in the proof of loss; the value of the property to be much less than the insurance; that Mrs. Weems was in financial distress at the time of the fire.

Assignments VII and VIII relate to the admission of the testimony of certain witnesses relating to the trial and acquittal of Mrs. Weems, C. T. Brooks and Mr. and Mrs. Chase on the charge of arson and conspiracy to commit arson.

Assignment IX complains of the action of the Court in considering the acquittal of Mrs. Weems and the others as a circumstance to be considered along with other evidence.

Assignment XI charges that the Court held that circumstantial evidence cannot overcome the positive denial of witnesses.

This assignment is overruled. The Court made no such holding but did hold (1) that the circumstantial evidence in this case was not sufficient to establish the alleged conspiracy or the charge that the household goods and beauty shop equipment were not in the premises on the date of the fire; (2) that the circumstances were not sufficient to overcome the testimony of Mrs. Weems, Mrs. Oliver and their witnesses.

Assignment XII raises the question of other insurance—the Farmers Mutual.

Assignment XIII raises the question that the Policy #24794 being on household goods and personal effects did not cover beauty shop equipment.

Mrs. Weems has filed a motion to strike certain assignments of error of appellant on the ground that they

do not comply with the rules of this Court. We do not think it necessary to pass on the motion in view of our conclusions here to follow.

In considering the question of incendiarism, which is sought to be proved by circumstances it is well to refer back to the charges made in the bill and then see what evidence there is for or against them.

The only evidence offered to support the charge against Mrs. Oliver along with Mrs. Weems in that connection is that the former is the step-daughter of the latter, that her mortgage was dated June 1, 1939 at the beginning and May 20, 1940 at the end, that the $1000.00 policy securing her mortgage was dated fourteen days before the fire occurred, and that Mrs. Oliver assisted in filling out the proofs of loss on both policies.

Both of these defendants fully explain these facts in their answer and support it by their own testimony with documents and with other witnesses.

Mrs. Weems married the father of Mrs. Oliver when his children were quite young and reared them. He died several years ago after an extended illness. Commencing at that time she loaned Mrs. Weems various sums of money all too substantial to be considered by Mrs. Weems as a gift. As far back as 1938 Mrs. Weems had given her a note for $800.00; on account of the expense of a serious operation Mrs. Weems made her a note for $1000.00 dated June 1, 1939, which is exhibited; this accounts for the date in the forepart of the chattel mortgage above referred to. The mortgage was evidently not actually executed until May 20, 1940 because that is the date of acknowledgment; it was not registered until the following November. This certainly bears the earmarks of the usual family transaction. The beauty shop equipment was insured and a standard mortgage clause

was attached to protect Mrs. Oliver. Several cancelled checks to Mrs. Weems are in the record, the earliest shown being dated April 23, 1930 or $100.00.

It is shown that Mrs. Oliver has a good reputation and holds a responsible position. Being able to use the typewriter she simply typed the proofs of loss for her step-mother.

Mrs. Weems explains, and she is supported by Pressley, the insurance agent, that there was insurance on the beauty shop equipment long before June 5, 1943; that she had operated a shop in several places at different times but had ceased to do so last in Knoxville because the inspector got after her about not having renewed her personal license as a beautician, so she just quit and decided to store her equipment. When she told the agent of her intention to send the better part of it to the farm in Greene County, he said he would have to cancel the existing policy, which had about another year to run and he rewrote it through the Ed Wheeler Agency in Sentinel Policy #24794, because the other company would not carry a rural risk.

Thus it appears that the transaction between these defendants was undoubtedly genuine.

Both of these ladies testified that subsequent to the note transaction Mrs. Oliver at times paid bills from her own funds for Mrs. Weems and at other times out of Mrs. Weems' funds; that especially in latter 1942 and 1943 Mrs. Weems had not opened a bank account after moving to Knoxville and she left various amounts of money with Mrs. Oliver who issued her own checks for Mrs. Weems' obligations. Ex. "E" consisting of cancelled checks supports this.

The pertinency here is this, either Mrs. Weems did have money and Mrs. Oliver was not pushing her for her

debt, or Mrs. Weems did not have money but was not being pushed, because Mrs. Oliver would not have continued to advance funds if she were worried about the note.

■ Therefore, if Mrs. Oliver was not worried about the note, why should she become a party either to arson or to a fraudulent proof of loss. Thus, both defendants are clearly exonerated of setting up a fictitious debt and of procuring insurance immediately before the fire or with evil design; regardless of what may be said about Mrs. Weems there is surely not a scintilla of evidence that Mrs. Oliver participated in a fraudulent proof of loss.

This leaves only a question of law affecting Mrs. Oliver's right to recover, which will be discussed later under Assignment XIII.

The bill charges Mrs. Weems with having procured insurance in the Farmers Mutual on the residence prior to the issuance of the Sentinel policy covering the residence and other items.

The proof shows that Mrs. Weems' father, who died in 1941, bought the place for her placing it in her name and handling the entire transaction in 1938. At that time there was a $1400.00 policy of fire insurance on it with the Farmer's Mutual.

Her insurance agent, Pressley, testified that he first wrote insurance for her on beauty shop equipment in 1938 and sought a policy on the farm buildings, but "she said her father had some (in the Farmer's Mutual), but she didn't want to duplicate it. That was when I made my first inspection, and that was her alibi or excuse for not accepting the business from me or not placing the business with me." R. 510.

She had operated a beauty shop since 1936 and always carried insurance. They moved to the farm in 1939 but

she continued in the business in Greeneville until 1940. In 1941 she moved the equipment to the farm and started a restaurant in Latonia, Kentucky where she remained for about eight months. Then she moved to Pennington Gap, Virginia, rented a furnished beauty shop and remained there until September 1942, when she moved to Knoxville in the same kind of business and lived with Mrs. Oliver until she closed the beauty shop in the spring of 1943 because she did not renew her personal license as an operator and the inspector got after her. She then moved the equipment back to the farm in April 1943.

While she was in Pennington Gap, Virginia in the spring of 1942 she received a letter from Farmer's Mutual "saying my policy was out of force; that it had lapsed, and payments were due." The secretary, Gott, testified that he wrote such a letter. R. 223.

She later went to Knoxville, showed the letter and talked to Pressley and he wrote the policy in suit dated August 25, 1942.

Now there is a check issued by Mrs. Oliver "October —, 1942, paid October 12, 1942" to the Home Loan Ass'n. for $44.80, covering "Fire Ins. due Semi Annual Int. due by Mrs. Flossie Weems." It is clear that the insurance was that in Farmer's Mutual, which Mrs. Weems thought had lapsed.

Mrs. Weems, however, testified that she knew nothing about this check.

We think it entirely plausible that it was paid without her knowledge. When she left the farm in 1941 her step-daughter and husband, Edith and Bob Chase, who were jointly indicted, tried and acquitted along with Mrs. Weems for arson and conspiracy, moved to Mrs. Weems farm and residence and remained there until April 15, 1943, when they moved to a farm they had purchased.

Under the arrangement with them they were to keep up the semi-annual interest payments of $42.00 on the loan, there being no principal payments due, and the other expenses for the use of the place.

Afterwards Mrs. Weems never made any payments herself but left it to them and it is likely that during her peregrinations above mentioned she did not receive the notices. It is likely that Mrs. Oliver saw the notice shortly after Mrs. Weems moved to Knoxville in September 1942 and paid it without mentioning it to Mrs. Weems and without knowing that Mrs. Weems had been informed that the Farmer's Mutual policy had lapsed.

We think the evidence shows no intention on the part of Mrs. Weems to carry other insurance, that she was not negligent in regard to the matter, that she was misled by the letter from the Farmer's Mutual and acting in good faith thought she had no coverage in the Mutual when she took the Sentinel policy.

Both policies on the residence contain provisions making the policy void if there be other insurance. If necessary to discuss it, this would present a tricky legal proposition. We do not think it necessary. Mrs. Weems had a right to rely on the letter stating that her policy had lapsed in the Farmer's Mutual, she acting on that belief.

■ This Court holds that she did not have other insurance and did not violate the provision of the Sentinel policy. This disposes of Assignment XII.

The bill charges that the property was greatly over-insured beyond its value. The Chancellor found the value to be: the residence, $3000.00; the household furniture, $800.00 to $2,000.00; the beauty shop equipment at more than $2,000.00.

The farm with improvements was purchased in 1938 for $1800.00 on September 24. One year and three

months later on January 18, 1940, the inspector for the Home Loan appraised the farm at $2900.00, valuing the residence at $1200.00 of this total. The loan was made for $1400.00 and was covered by Farmer's Mutual, $850.00 on the residence and $550.00 on the barn, being supposedly three-fourths of the value.

World War II began December 7, 1941. As has always occurred prices began to rise because of the enormously increased demand for practically every product both raw and finished and the Government offered high wages to attract workers in war goods manufacture. All of this is within judicial knowledge.

After the farm was purchased the residence was considerably repaired and improved.

Perhaps the best qualified disinterested witness as to the value of the residence at the time of the fire was W. H. Bible. He had resided in the vicinity for years, is a property owner and a carpenter, was familiar with the house and knew of the improvements Mrs. Weems had made on it. He placed the value at $2500.00 to $3000.00.

The insurance agent who had seen the place in 1938 and again in August 1942 placed the value at the time of loss at $3500.00 to $4000.00. Others said $3000.00. to $4000.00.

There is no evidence that it was not worth much more than the $1250.00 for which it was insured.

The household furniture insured for $1000.00 was said by the agent, Pressley, to be worth $2500.00, by Mr. and Mrs. Chase who occupied the house two years $2,000.00, by Mrs. Weems $2,200.00 and by another step daughter, Mrs. McDonald, $2,200 to $2,500.00.

The beauty shop equipment was valued by Mrs. Weems and by the agent at $2700.00 to $3000.00. This property

was bought from two sources in 1936 and 1937 for something less than a thousand dollars. Part was practically new even though bought as used equipment from an operator and had been used and stored as heretofore described. However, it is testified and it is a matter of general knowledge that this type of commodity along with many others became scarce during the war and increased in value.

■ We hold, therefore, that the Chancellor's valuations are well supported by the evidence. This disposes of Assignment VI.

It is not so alleged in the bill other than the allegation about her farm being advertised for foreclosure, but an effort was made to show in the proof that Mrs. Weems was in straitened circumstances at the time of the fire, as an incentive or motive for arson.

There was a delinquency of only one interest payment with the Home Federal Association when the fire occurred. Mrs. Weems thought the Chases had paid it and she did not know about the advertisement for foreclosure until just after the fire when she received a letter from Mrs. Doris Chandler stating that if the place was going to be foreclosed, they wanted to buy it. Mrs. Weems then paid the $42.00 by telegram.

It is apparent, therefore, that there was no connection between the taking out of Policy #24794 on the beauty shop equipment fourteen days before the fire and the advertisement of the farm for foreclosure; it has already been shown the policy was rewritten on June 5, 1943.

There is no evidence otherwise that she was out of funds. She said she had money and so did Mrs. Oliver; she was engaged in business. When she quit the beauty shop, she bought an interest in a restaurant.

This disposes of that part of Assignment X and of V.

This disposes of all so-called suspicious circumstances prior to the fire except the charge that Mrs. Weems and one C. T. Brooks were seen at the premises just preceding the fire and were seen fleeing after the fire began and that they had been indicted.

There is no question that they were on the premises within a half hour to one hour before the fire, but there is no evidence to support the statement that they were seen fleeing after the fire began.

Mrs. Weems was intending to move back to the farm. The Chases had moved away in the spring and the residence was unoccupied. Brooks had an automobile and was a friend of hers. She had assembled some clothing, groceries and incidentals such as a broom and mop and had Brooks drive her from Knoxville to the farm that Sunday morning so that she could clean up the house and put some food there. They left Knoxville between seven-thirty and eight, drove the sixty-six miles at usual highway speed and arrived sometime between nine and ten o'clock. They did not have a timepiece with them and are not able to give the time exactly. The day was warm and bright when "God is in his heaven and all's right with the world".

The car was a 1940 grey Chevrolet Coupe convertible and the top was down. Mrs. Weems was wearing a white dress and white scarf. About the corporate limits of Knoxville they picked up a soldier and dismissed him about 100 feet before turning off the main highway to the side road leading up to the farm residence which is about a quarter of a mile off the main highway.

They drove up near the residence and parked. They took the things in the house and while she was cleaning, dusting and putting away clothes he put a hasp on a closet or wardrobe door upstairs with screws. She made

several trips upstairs carrying clothes and he made one trip after he finished with the hasp. She had commenced burning paper and trash in the kitchen range, when he took a walk up hill toward a tenant house about 500 feet away. He did not go all the way but saw some of the people, the Carters, who lived in that house. Then as he turned back to the residence he saw flames coming out of the kitchen chimney, so he told her not to burn any more stuff. They watered down the fire in the stove and after getting things straightened up, they left and drove to the Thompson farm some six miles away in order that Brooks might look at some horses. The Thompsons were having dinner, so she stayed in the car and they sent her a glass of water. They left there about two or two thirty and got back to Knoxville at four to four-thirty.

Next morning a Mrs. Smith called Mrs. Weems and told her about the fire. She had fallen the evening before after returning to the restaurant at Knoxville where she worked and had an interest and could not get out to the farm until about the fourth day.

In order to show that they were fleeing the fire, complainant called W. H. Bible, above mentioned. He said that on that morning between eleven and twelve noon he was walking along the main highway (Andrew Johnson) on his way to his house and that as he approached this side road he saw a grey Chevrolet Coupe convertible with top down come out of this side road into the highway; that as it passed him there were two men in it looking away from him and pointing to something, he knows not what. They were going about 35 m. p. h. and he did not know them. As he continued on another car drove up and called his attention to the Weems house being afire.

Now, Mr. Bible lived only a quarter mile away from the Weems house, was well acquainted with her and surely would not have mistaken her for a man, if she had had on dark clothes; much less so if she was wearing a white dress and white scarf on her head.

Neither Mr. nor Mrs. Carter saw Mrs. Weems and Brooks that morning. Mr. Carter was lying under a shade tree and she was in her house busy. She had seen this car there several times previously and was paying no attention, although she said it was about eleven when she noticed the car that morning and about thirty to forty-five minutes elapsed before her little boy called their attention to the smoke coming out of the front of the house. They had not had dinner. She did not notice them drive away and neither she nor any of the family knew what time the car departed. Mrs. Weems and Brooks, of course, say they do not know what caused the fire, unless the flue in the kitchen was defective and the flames from the paper and trash got into the attic. Mrs. Weems does not smoke and Brooks says he was not smoking in the house. There was testimony that there was a crack in the flue which had a piece of tin over it and that several years before the tin slipped down and a fire started in the kitchen attic.

Complainant contends that the fire could not have started in the kitchen attic because, and the proof so shows, that smoke was first seen coming out of the front of the house from the windows.

But the structure of the house was such that this contention is of little force. The house was two-story in front with a wooden shingle roof and one story in the back or kitchen part with a sheet metal roof. The metal roof would tend to hold down the fire for a short while and might have driven it towards the front. Mr. Bible

said it was just a few minutes before it was afire all over, after he first saw the smoke in front. The Carters did not wait to speculate on the question because they had some property in the barn back of the house, so that they at once bestirred themselves to go see about it.

Furthermore, where there is total destruction and no eyewitnesses to the starting of a fire few questions are more fraught with speculation as to how and where a fire is started.

Complainant called a Mrs. Lovett to prove that when Mrs. Weems and Brooks returned to the restaurant about half past four they were both intoxicated and that she heard them talking about the fire in the stove, that they said they started it with kerosene and paper and just went off and left it. This testimony is not worthy of belief, the decided weight of the evidence is that Mrs. Weems does not use intoxicants.

This witness does drink and admitted that she had been picked up by the police and taken home more than once and that she had had a bottle of beer that morning before testifying and was quite nervous. She was not corroborated by the two people she said also heard it.

Complainant called three other witnesses from whom in October 1946 it had obtained affidavits that in the spring of 1946 Brooks had said:

"If the truth was known me and Flossie both would be in the Penitentiary for what happened in Greeneville about three and a half years ago."

Two of these witnesses worked at the tea room with Mrs. Weems and the third was the husband of one of them. When they were put on the stand a year later all three repudiated the affidavit.

That is about the substance of the evidence as to incendiarism except that relating to the charge that Mrs.

Weems did not have anything like the amount of personal property in the residence that she claimed.

It does not comport with common experience that two people of normal intelligence, one of whom particularly was well known in the community, would set fire to a residence at midday and risk being seen about the property before and after the structure had begun to burn; especially knowing that the Carters lived so nearby.

There are too many more subtle and efficient methods of committing arson.

The fire was reported to the State Fire Marshal. His deputies investigated it and had Mrs. Weems and Brooks appear for examination. Shortly afterwards they were indicted along with Mr. and Mrs. Chase. Aside from this action taken against Mrs. Weems and Brooks, there is nothing in this record that gives the slightest excuse for indicting Mr. and Mrs. Chase. There was a prompt trial and all were acquitted.

In this suit the complainant has sought to show by these deputies that many items listed in the proof of loss were not in the residence at the time of the fire.

The fire occurred June 20, as stated. On July 12 the deputies began their investigation by going to the scene and making a casual survey. August 2 they removed the kitchen metal roof and sifted the ashes. They found metal remains of most of the beauty shop items but not all of them; also remains of the kitchen range, iron bed and other household items but not all that would leave metal remains such as her father's shotgun, silverware, marble from the antique hall stand, hinges, metal from shade rollers, etc.

They heard that she had some stuff stored in Knoxville. When she was questioned about it she readily told them about it. When they saw the stuff in Knox-

ville they concluded that some of the items fitted the description of some of the items in the proof of loss and so testified.

We think Mrs. Weems has fairly explained any ostensible discrepancies.

She said that when she quit the beauty shop, she sent most of her equipment to the farm. There is no doubt about this. She rented a truck, hauled it there and others saw the stuff there. She did not take it all, however, because she could not get it all on the truck so she left the pieces that were not in good condition and put them in the back of the restaurant of which she was part owner. When a short while before the fire she decided to sell her interest in the restaurant and move to the farm she moved the stuff from the restaurant to the storage company.

Complainant made an effort to show that she moved it surreptitiously but it does not so appear. She moved it in broad daylight out a side window instead of taking it through the front because customers were being served. The storage company was across the street to the side of the restaurant and this was the most direct way to move the stuff.

The deputies said they saw a hall rack in the storage company but that it was wrapped except the upper part and they did not unwrap it and did not know whether it had marble on it.

There was some proof that a piece of equipment was found at Mrs. Worsham's home. Mrs. Weems said it was not hers but had been brought into the Dale Avenue beauty shop while Mrs. Weems'. machine was being repaired; that when she quit the shop it was still there and that Mrs. Worsham told her later that she had moved it to her home.

The deputies heard that Brooks had moved some wicker furniture from the farm to his residence in Knoxville. That was true. Brooks told a somewhat odd story about how he acquired some furniture. He said he had run across some people from outside the state who were traveling or moving in a truck loaded with their furniture; that the truck broke down and he spent $55.00 getting it fixed, so they sold him their furniture for what they owed him; that he stored it out at Mrs. Weems farm residence which was not then occupied; that later he and Mrs. Weems swapped bedroom suites; that later he did take his wicker furniture to Knoxville.

Mrs. Weems knew nothing about how he got the lot of furniture but she said that she saw the stuff out at the farm and did make the swap of bedroom suites.

The thing, however, that weakens the testimony of the fire marshals is that they did not sift the ashes until long after the fire while in the meantime anybody could have gone there and carried off anything unmolested. And it is a singular thing that months later the remains of her father's shotgun, which was not in the proof of loss, were found in the field in that vicinity; also some of her silverware was found in the bottom of the cistern by the Carter house on the place and it was badly tarnished and scratched.

We shall conclude by saying that Mrs. Weems has a good reputation, that she has given plausible testimony about every phase of the case, and that no motive has been shown that she could possibly have to burn property of value largely in excess of the amount of insurance carried on each item in the policies. We think that such discrepancies as may exist between her deposition and the statements made before the fire marshal must be resolved in her favor.

We, therefore, overrule the first six assignments and the second part of the tenth assignment.

Assignments VII and VIII are overruled.

Complainant was the first to bring out the charge of arson and conspiracy. It was charged in the bill and was a severe and serious attack on her character. She had the right to show that she and the others indicted had been acquitted by the jury. It would be a monstrous thing to permit the complainant to allege the indictment in a bill on which it obtained the benefit of the injunctive process of the Chancery Court but to deny defendant the right to show an acquittal.

The allegation was highly prejudicial to the defendant, standing alone. It is not a question of the competency of the evidence, but invited error, if it be erroneous. We need not discuss the question of the admissibility in a civil case of the record of conviction or acquittal.

Complainant made the allegation in connection with other allegations all tending to show that defendant would probably be convicted of the crime charged. If there had been a conviction, it would no doubt have sought to show the fact in this case. Since, however, there was an acquittal, complainant desires to eliminate the subject. What would have been complainant's conduct if this case had been tried before the criminal case was terminated? Gentry v. Betty Lou Bakeries, 171 Tenn. 20, 100 S. W. (2d) 230.

As to Assignment IX we do not consider it necessary to discuss the question of whether the evidence of acquittal could be considered as a circumstance along with other evidence as proof in favor of defendant, because without injecting the criminal action into this case, there is abundant evidence to sustain the Chancellor's findings.

Assignment XIII complains of the part of the decree allowing a recovery on policy #24794. The basis of this assignment is that this policy covers household goods and personal effects, usual or incidental to occupancy of a dwelling house and does not mention the beauty parlor equipment expressly or impliedly; in other words, there is no description of the goods to be insured as beauty parlor equipment.

This would present a serious question under a different factual situation and might perhaps call for a new suit to seek a reformation of the contract and would involve the question of whether or not Mr. Pressley was a licensed broker and, therefore, excepted from the provisions of Code Section 6087 making all persons soliciting insurance agents of the Company, except duly licensed fire insurance brokers.

Here, however, we have simply two $1,000.00 coverages on household goods and personal effects and the proof shows there was $2,000.00 worth of such goods exclusive of the beauty shop equipment. That being true we see no reason why the defendant should not be allowed to recover on each of these policies as they are written. The Company takes the position that the beauty shop equipment is not household goods and personal effects and is, therefore, not covered under the policy; and if that be true so far as the knowledge of the Company goes, then we see no reason why the insured should not recover on the policy as a household and personal effects coverage since the value was there in the kind of items described in the policy.

This disposes of all of the assignments made by complainant and we affirm the decree of the Chancellor.

Complainant will pay the costs.

Anderson, P. J., and Felts and Hickerson, JJ., concur.